**Abdul MAJID, Plaintiff,**

v.

**Wayne WILHELM, Deputy Superintendent, Sergeant Tim Cherry, Sergeant R. Wexler, and Corrections Officer Carol Behrens, Defendants.**

**No. 97 Civ. 4371(JES).**

United States District Court, S.D. New York.

Aug. 22, 2000.

Cadwalader, Wickersham & Taft, New York, NY (Steven G. Brody, of counsel), for plaintiff.

Eliot Spitzer, Attorney General of the State of New York, New York, NY (Laura Jones, Assistant Attorney General, of counsel), for Defendants.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiff Abdul Majid ("plaintiff"), an inmate at the Sullivan Correctional Facility ("Sullivan"), brings this action against Defendants Wayne Wilhelm ("Wilhelm"), Deputy Superintendent of Security at Sullivan, Sullivan Sergeant Tim Cherry ("Cherry"), Sullivan Sergeant Robert Wexler ("Wexler"), and Sullivan Correctional Officer Carol Behrens ("Behrens") (collectively "defendants"). He alleges that (1) defendant Cherry used excessive force against plaintiff in violation of the Eighth Amendment to the United States Constitution; (2) defendant Behrens violated his First Amendment rights by confiscating a newspaper in plaintiff's possession; and (3) defendant Wilhelm violated his First Amendment rights by refusing to provide him with meals that conformed to his religious dietary restrictions.[1] Defendants move for summary judgment arguing that they are entitled to qualified immunity and, in any event, none of their alleged actions constitute constitutional violations.

## BACKGROUND

The following facts are based largely upon plaintiff's account of the events giv-

ing rise to this action. Plaintiff is a Muslim inmate who has been incarcerated by the New York State Department of Corrections since 1982. *See* Plaintiff's Local Civil Rule 56.1 Statement dated November 12, 1999 ("Plaintiff's Statement"), at ¶¶ 1–2. On September 5, 1996, plaintiff was returning from the law library to his housing block and attempted to pass through "cross-gates," a security checkpoint at Sullivan. *See id.* at ¶¶ 8–10. Upon passing through the checkpoint, defendant Behrens confiscated a day-old newspaper plaintiff was carrying, believing it to be a same-day newspaper which is viewed as contraband under Sullivan's rules. *See id.* at ¶¶ 9–10, 50. The newspaper was placed on a table at the security checkpoint while plaintiff was further questioned. *See id.*, Exhibit ("Exh.") A, Deposition of Abdul Majid dated April 2, 1998 ("Majid Dep.") at 8.

After the paper had been taken from him, plaintiff allegedly informed defendant Behrens that he would take the newspaper back to the library and picked up the newspaper from the table. *See id.* At that point, defendant Cherry, who was also at the security checkpoint, became upset with plaintiff for taking the newspaper and grabbed plaintiff by his arm and neck and knocked the folder plaintiff was carrying out of his hand. *See id.* at 8, 18. Plaintiff then backed away from defendant Cherry, and as Cherry continued to move toward plaintiff in an "aggressive manner," plaintiff defended himself by backing away and by making "a few thrusts and knock[ing] [Cherry's] hand away." *See id.* at 8. Thereafter, defendant Cherry apparently tired and leaned against a window to catch his breath, while plaintiff stood passively. *See id.* at 19–20.

In the interim, an officer that was present at the scene called an alarm and several officers responded. *See id.* When the

---

1. Plaintiff has withdrawn all other claims in this action, and accordingly this Court hereby grants summary judgment as to such claims and dismisses this action as to defendant

Wexler. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment dated November 12, 1999 ("Plaintiff's Memo.") at 1.

officers arrived, plaintiff believed he would be subject to a "pat and frisk" in accordance with normal procedures and willingly without prompting turned to face the wall where he was patted down for weapons. *See id.* at 20, 23. As plaintiff was being patted down. Cherry was allegedly very upset and directed the officers to throw plaintiff on the ground.[2] *See id.* at 20–21, 23. As plaintiff was being pushed to the ground, Cherry allegedly joined in and caused plaintiff to injure his knee. *See id.* at 21, 23, 25. This injury caused plaintiff pain for approximately six to eight weeks. *See id.* at 29.

After the incident, plaintiff underwent a prison disciplinary hearing after which he was sentenced to four months in Sullivan's Special Housing Unit ("SHU"). *See* Defendants' Statement of Material Facts Pursuant to Local Rule 56.1 dated October 1, 1999 ("Defendants' Statement") at ¶¶ 19–20, 26. His newspaper was not returned to him, and plaintiff never filed a grievance with Department of Corrections with respect to the newspaper. *See* Plaintiff's Statement at ¶ 24; Defendants' Statement at ¶ 24.

*Plaintiff's Diet*

Plaintiff further alleges that while he was confined in SHU between September 5, 1996 and November 4, 1996, he was in large part provided with meals that violated his religious dietary requirements as a Muslim. *See* Plaintiff's Statement at ¶¶ 49, 56–57. As a Muslim, plaintiff must eat only "halal" meat, or non-pork meats that have been slaughtered in accordance with Islamic religious dictates. *See* Majid Dep. at 50–51. He acknowledges that he could eat an entire meal served to him if the meat served was fish, and that he could eat any vegetables in his meal that

had not been touched by non-halal meat. *See id.* at 51–52. He also admits that he could eat non-halal meat to the extent necessary to avoid starvation. *See id.* at 50.

While plaintiff was in the prison's general population, he was served meals in the mess hall, and he could avoid being served non-halal meat by asking the server to refrain from placing any such meat on his tray. *See* Defendant's Statement at ¶ 35. However, when he was placed in SHU, plaintiff received pre-prepared trays of food on which non-halal meat (often with sauces) had already been placed on the vegetables. *See* Plaintiff's Statement, Exh. B, Deposition of Wayne Wilhelm dated June 21, 1999 ("Wilhelm Dep.") at 66; Majid Dep. at 51. As a result, plaintiff would usually refrain from eating the entire dish. *See* Majid Dep. at 51.

While plaintiff requested from Defendant Wilhelm that he receive a meatless tray or, alternatively, that meats be separated from the remainder of the foods, Defendant Wilhelm denied such request. *See* Defendants' Notice of Motion dated October 1, 1999 ("Defendants' Notice"), Exh. I, Memorandum from Wayne J. Wilhelm to A. Majid dated October 11, 1996 ("Wilhelm Memo."). In the denial of this request, Defendant Wilhelm referenced a Department of Corrections' food service directive that required that no meatless trays were to be provided, and indicated Sullivan would soon be commencing an alternate meal that could meet plaintiff's religious concerns.[3] *See id.* In his deposition, Wilhelm also indicated that the trays used to serve SHU inmates were too small to separate the meat from other portions of the meal and that when items like stew

---

**2.** Plaintiff has not sued the other correctional officers involved in this matter, and has stated that they "weren't trying to beat [him] up . . . [and] weren't trying to be particularly malicious." *See* Majid Dep. at 25.

**3.** In reviewing plaintiff's grievance relating to this matter, Sullivan Superintendent Robert Kuhlmann on October 23, 1999 similarly

found that the facility did not "recognize meatless trays," and that the incorporation of the alternate diet approximately two weeks later was "sufficient to resolve this grievance." *See* Defendants' Motion, Exh. E, Grievance Review Form dated October 23, 1996.

were served, separation of such items was not possible. *See* Wilhelm Dep. at 66. Ultimately, approximately two months after plaintiff had been placed in SHU, Sullivan implemented a new meatless alternative meal which met plaintiff's religious requirements. *See* Majid Dep. at 54.

## DISCUSSION

A court may grant summary judgment only if it determines that there are no genuine issues of material fact based on a review of the pleadings, depositions, answers to interrogatories, admissions on file and affidavits. *See* Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When ruling on a summary judgment motion, a court must construe the facts in a light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*The Excessive Force Claims*

■ The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual" punishment on prison inmates. *See Farmer v. Brennan,* 511 U.S. 825, 829, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). This prohibition encompasses any unnecessary and wanton use of excessive force, even where significant injury is not demonstrated. *See Hudson v. McMillian,* 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Accordingly, in assessing a claim of excessive force, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *See Hudson,*

503 U.S. at 7, 112 S.Ct. 995 (quoting *Whitley v. Albers,* 475 U.S. 312, 321, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)).

■ Here, taking all of plaintiff's allegations as true, issues of material fact exist that preclude the Court from granting summary judgment as to plaintiff's claims of excessive force. In plaintiff's version of the events that took place at the security checkpoint, he acted in a generally passive, non-confrontational manner, and readily attempted to comply with prison procedures and official directives that he be checked for weapons. *See* Majid Dep. at 8–9, 18–20. In contrast, he alleges that defendant Cherry acted in an overly aggressive manner, and ultimately injured him by using wholly unnecessary force and directing his subordinates to do the same. *See id.* at 18–20, 25. While defendant argues that plaintiff overstates the severity of defendant's actions and that such actions constituted only a good faith effort to maintain discipline, plaintiff's sworn testimony is more than sufficient to create material issues of fact and precludes summary judgment as to this issue.[4]

*The Newspaper First Amendment Claim*

Defendants move for summary judgment as to plaintiff's First Amendment claim regarding the confiscation of his newspaper on the grounds that plaintiff has failed to exhaust administrative remedies as required by the Prison Litigation Reform Act of 1996 ("PLRA"). The PLRA amended 42 U.S.C. § 1997e(a) to require that "no action shall be brought with respect to prison conditions under section 1983 or any other federal law ... until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (West Supp.2000). Here, plaintiff seeks monetary damages resulting from defendants' actions and it is beyond dispute that plaintiff has failed to exhaust

---

4. Similarly, to the extent that defendant Cherry argues he is entitled to qualified immunity with respect to plaintiff's excessive force claim, issues of material fact regarding the reasonableness of his actions preclude a grant of qualified immunity. *See Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993).

his administrative remedies with respect to this claim. *See* Defendants' Statement at ¶ 24; Plaintiff's Statement at ¶ 24. Thus, the Court must determine whether the PLRA's administrative exhaustion requirement bars plaintiff from proceeding in this forum.

The phrase "with respect to prison conditions" is not defined anywhere in 42 U.S.C. § 1997e(a). The phrase, however, is defined in 18 U.S.C. § 3626 which was also adopted as part of the PLRA. Section 3626(g)(2) states, in part, that

> the term "civil action with respect to prison conditions" means any civil proceedings arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison.

18 U.S.C. § 3626(g)(2) (West Supp.2000).

 In analyzing the phrase "with respect to prison conditions" in § 1997e(a), the Court relies upon the same language defining the phrase in § 3626(g)(2), because the same or similar language used in different parts of a statute should be interpreted as having the same or similar meaning. *See Mertens v. Hewitt Associates,* 508 U.S. 248, 260, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993); *see also Diezcabeza v. Lynch,* 75 F.Supp.2d 250, 253 (S.D.N.Y. 1999); *Beeson v. Fishkill Corr. Facility,* 28 F.Supp.2d 884, 888–89 (S.D.N.Y.1998) (each finding that the phrase "with respect to prison conditions" encompasses the definition found in § 3626(g)(2)). Accordingly, the Court is constrained to conclude that plaintiff's claim regarding the deprivation of his newspaper falls within the plain language of § 3626(g)(2) that defines "action with respect to prison conditions" to include any civil proceeding with respect to "the effects of actions by government officials on the lives of persons confined in prison." 18 U.S.C. § 3626(g)(2).

Nonetheless, plaintiff contends that because he seeks monetary relief that is not available under the grievance program at Sullivan, exhaustion of his administrative claims is futile and unnecessary. Plaintiff apparently relies on several decisions by courts that have held that the administrative exhaustion requirement of the PLRA is inapplicable where a plaintiff seeks monetary relief, and where such relief is not available through the administrative process. *Compare Garrett v. Hawk,* 127 F.3d 1263, 1267 (10th Cir.1997) (holding that the administrative exhaustion requirement of the PLRA inapplicable in those cases where the administrative process does not provide for the relief requested); *Whitley v. Hunt,* 158 F.3d 882, 886–87 (5th Cir. 1998) (same); *Lunsford v. Jumao–As,* 155 F.3d 1178, 1179 (9th Cir.1998) (same); *Polite v. Barbarin;* No. 96 Civ. 6818, 1998 WL 146687, at*2 (S.D.N.Y. March 25, 1998) (same), *with Nyhuis v. Reno,* 204 F.3d 65, 67 (3rd Cir.2000) (holding that exhaustion is required even where ultimate relief sought is not available); *Freeman v. Francis,* 196 F.3d 641, 645 (6th Cir.1999) (same); *Perez v. Wisconsin Dep't of Corrections,* 182 F.3d 532, 537–38 (7th Cir. 1999) (same); *Alexander v. Hawk,* 159 F.3d 1321, 1325–28 (11th Cir.1998) (same); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 443 (S.D.N.Y.2000); *Cruz v. Jordan,* 80 F.Supp.2d 109, 116–117 (S.D.N.Y.1999) (same); *Vasquez v. Artuz,* No. 97 Civ. 8427, 1999 WL 440631, at *6 (S.D.N.Y. June 28, 1999) (same); *Edney v. Karrigan,* 69 F.Supp.2d 540, 544 (S.D.N.Y.1999) (same) (collecting cases); *Beeson,* 28 F.Supp.2d at 889 (same).

 The Court is not persuaded by this line of cases because they are inconsistent with the plain language of § 1997e(a) and Congress' amendment of this provision in 1996. The PLRA as enacted in 1996 deleted various provisions from § 1997e(a), including, *inter alia,* the requirement that a prisoner exhaust all "plain, speedy, and effective remedies as *are available,*" and removed all references to judicial or executive approval of those administrative reme-

dies. *See Beeson,* 28 F.Supp.2d at 892 (emphasis added). This amendment, which must be presumed to have real and substantial effect, suggests strongly that "Congress now conditions prisoner suits on the exhaustion of such administrative remedies as are available, without regard to whether those remedies are 'effective,' without regard to whether they substantially comply with 'minimum acceptable standards,' and without regard to whether they are 'just and effective.' " *Beeson,* 28 F.Supp.2d at 893 (quoting *Spence v. Mendoza,* 993 F.Supp. 785, 787 (E.D.Cal.1998)). Furthermore, any construction of § 1997e(a) that conditions exhaustion on the adequacy of the administrative grievance procedure of each state would make 1997e(a) subject to the vagaries and peculiarities of state law and frustrate Congress' stated intent of reducing the "heavy volume of frivolous prison litigation in federal courts." *Id.* at 893 (citations omitted). For all of these reasons, the Court concludes that the PLRA mandates exhaustion even in those cases where a prisoner seeks relief that is unavailable through the administrative process.[5]

Moreover, to the extent that the state grievance procedure may not provide monetary relief, that is not a persuasive reason to disregard the clearly manifested Congressional intent that claims regarding prison conditions be exhausted before proceeding in the federal courts. To the extent that monetary relief is not available, it would be open to the plaintiff to argue in a subsequent federal suit that the doctrines of res judicata and collateral estoppel do not preclude a claim for monetary relief in another forum, since such relief could not have been asserted before the administrative agency. Of course, however, both sides may face preclusive effect in a subsequent federal suit as to the facts which underlie the grievance to the extent these facts are common to both proceedings. Nonetheless, that circumstance does not in itself make the remedy unavailable in another forum.

### Denial of a Religiously–Mandated Diet

Finally, plaintiff alleges that defendant Wilhelm, by refusing for a two month period to provide him with a vegetarian meal or a meal in which non-halal meat was served separately from vegetables, violated his First Amendment right to receive a diet that conformed to his religious requirements. Defendant argues that defendant Wilhelm was not personally involved in the denial of this alleged violation of plaintiff's constitutional rights and, in any event, is entitled to qualified immunity.

■ Personal involvement of defendants in an alleged constitutional deprivation is a prerequisite to an award for damages under 42 U.S.C. § 1983. *See McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). However, in the context of a supervisory official, "personal involvement ... may be shown by evidence that ... the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Here, defendant claims that his only involvement in the instant matter was to send a memo to plaintiff explaining prison policy regarding meatless trays and directing complaints to the prison chaplain. Moreover, defendant claims that his lack of action should be viewed in the context of the prison changing its policy regarding meatless trays some time after plaintiff's complaints arose.

5. The question remains undecided by the Second Circuit. *But see Snider v. Dylag,* 188 F.3d 51, 55 (2d Cir.1999) (noting in dicta "that it is far from certain that the exhaustion requirement of 42 U.S.C. § 1997e(a) applies to deliberate indifference claims in the context of the instant one, under § 1983, where the relief requested is monetary and where the administrative appeal, even if decided for the complainant, could not result in a monetary award").

 Nonetheless, questions of fact exist as to whether defendant exhibited indifference to plaintiff's rights in violation of the First Amendment. Defendant concedes that he was aware that plaintiff was a Muslim and that for religious reasons plaintiff had directly requested from him a change in the manner his meals were served. *See* Wilhelm Dep. at 64. He was also aware that several means of satisfying plaintiff's request for a religious diet were available, including serving a wholly vegetarian meal or by simply separating meat items from the vegetables. *See id.* Moreover, and most importantly here, defendant's duties as Deputy Superintendent of Sullivan were wide-ranging and broadly defined, and included "operational issues," "complaints" and "cleanliness." *See id.* at 16–17. In this fashion, defendant admits that all prison security officers reported to him and that he was responsible for overseeing the SHU and took an almost daily tour of this area. *See id.* at 16–17.

In such circumstances, whether or not prison policy was scheduled to change in the near future, this Court is unable to conclude as a matter of law that defendant had no personal involvement in denying plaintiff food that complied with his religious needs during the time period at issue. Accordingly, defendant's motion for summary judgment in this respect must be denied.

 Issues of material fact also exist with respect to defendant's claim of qualified immunity. State officials who are sued under § 1983 are entitled to qualified immunity from liability from damages for their discretionary acts "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

*See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Here, an inmate's First Amendment right to a meal consistent with his religious dictates has been clearly established in this Circuit since 1975. *See Kahane v. Carlson,* 527 F.2d 492, 495 (1975) (holding that "prison authorities are proscribed by the constitutional status of religious freedom from managing [an] institution in a manner which unnecessarily prevents [an inmate's] observance of his dietary obligations"); *See also Moorish Science Temple of America, Inc. v. Smith,* 693 F.2d 987, 990 (2d Cir.1982) (reversing dismissal of claim alleging that failure to provide a diet conforming to Muslim dietary restrictions is a constitutional violation).

 Of course, "[p]rison authorities have reasonable discretion in selecting the means by which prisoner's rights are effectuated." *See Kahane,* 527 F.2d. at 496. Here, defendant claims only that he was under no obligation to provide plaintiff with a nutritionally deficient meal even though he undoubtedly faced rather minor logistical difficulties in separating meat items from vegetables on the small trays used for inmate food. However, defendant has failed to provide the Court with any evidence of the nutritional deficiency of meatless trays or that it was overly burdensome for him to provide a different size tray to plaintiff that could separate non-halal meat from permissible vegetables. In such circumstances, issues of material fact remain as to whether defendant's actions constitute a reasonable exercise of his discretion in view of the existing law, and the Court must therefore deny defendant's motion for summary judgment on the grounds of qualified immunity.[6]

---

**6.** Defendant Wilhelm argues further that he is entitled to qualified immunity because he deferred taking action in deference to the conclusion of a grievance procedure relating to plaintiff's food complaints. *See Colon v. Coughlin,* 58 F.3d at 873. *Colon* is readily distinguishable from the instant case, as there a prison superintendent deferred action on an inmate letter complaining that contraband had been planted in his cell pending an administrative fact finding proceeding designed to allow the inmate to "substantiate the claim made in his letter." *Id.* Here, defendant was well aware of all the relevant facts relating to plaintiff's complaint that his meals did not conform to religious dictates and simply re-

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. The parties are directed to file their Joint Pre–Trial Order on or before October 31, 2000, and appear at a Pre–Trial Conference on November 6, 2000, at 3:00 p.m. in Courtroom 705, 40 Centre Street.

It is **SO ORDERED.**

fused to take action. In such circumstances, defendant may not avoid fulfilling his constitutional duty to provide inmates with religiously required diets merely by finding that another tribunal was also considering the complaint.